IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SCOTT GAGNON, | )<br>)<br>) |
| Plaintiff, | )<br>) Case No: 15 C 4306 |
| v. | )<br>) Magistrate Judge Jeffrey Cole |
| CAROLYN COLVIN, Acting<br>Commissioner of Social Security, | )<br>)<br>) |
| Defendant. | )<br>) |

## MEMORANDUM OPINION AND ORDER

The plaintiff, Scott Gagnon, seeks review of the final decision of the Commissioner ("Commissioner") of the Social Security Administration ("Agency") finding that he is liable for an overpayment of Social Security Disability Insurance Benefits in the amount of $31,408.70 for the period of June 2007 through April 2012. (Administrative Record (R.) 9-10). Mr. Gagnon seeks review of that determination under 42 U.S.C. §405(g), hoping to have it overturned, and the Commissioner asks that the determination be affirmed.

### BACKGROUND

Mr. Gagnon has been a somewhat reluctant participant in these proceedings. Litigating *pro se*, he neither wrote, filed, nor signed his initial complaint. His mother did. [Dkt. # 1, 10]. He failed to show up at the first hearing in this case. [Dkt. # 10]. He was given six weeks to file a response to the Commissioner's opening brief in this case. [Dkt. #18]. He's neither filed a response, nor asked for more time in which to do so. It is now many weeks since his response was due. *Pro se* status does not relieve a litigant of his litigation duties; he must comply with orders and schedules. *Dukes v. Cox*, 657

Fed.Appx. 596, 598-99 (7th Cir. 2016); *Pearle Vision, Inc. v. Romm*, 541 F.3d 751, 758 (7th Cir. 2008); *Raven v. Madison Area Tech. Coll.*, 443 F. App'x 210, 212 (7th Cir. 2011). Not showing up for hearings, ignoring deadlines, and failing to ask for extensions does not evince a lack of legal sophistication that might on occasion be excused in the case of a *pro se* litigant. Instead, it seems Mr. Gagnon no longer cares about this case, which will have to be decided based on the administrative record and what the Commissioner has filed with the court.[1]

That's unfortunate, because the Commissioner's brief is rather sketchy and unilluminating. More is expected of a brief from an agency of the United States. *Freeport-McMoRan Oil & Gas Co. v. F.E.R.C.,* 962 F.2d 45, 47 (D.C. Cir.1992). Barely five pages long, it cites a single case, from the Eighth Circuit. In the main, it relies on sections from the agency's Program Operations Manual System, an internal guidebook that has no legal force here. *Schweiker v. Hansen*, 450 U.S. 785, 789 (1981); *Parker for Lamon v. Sullivan*, 891 F.2d 185, 190 (7th Cir. 1989). In other words, it is not the kind of "pertinent authority" that litigants are expected to cite to support their arguments. *See Crespo v. Colvin*, 824 F.3d 667, 674 (7th Cir. 2016)(" . . . arguments that are unsupported by pertinent authority, are waived (even where those arguments raise constitutional issues).").

Mr. Gagnon was found disabled and entitled to disability benefits due to anxiety disorder and affective/mood disorder in 2007. (R. 62). In February 2008, Mr. Gagnon submitted a Continuing Disability Review Report in which he informed the Social Security Administration that he had begun working at a large grocery store in January

---

[1] Mr. Gagnon has never shown he is indigent nor asked the court to recruit counsel pursuant to 28 U.S.C. § 1915(e)(1). *See Dukes v. Cox*, *supra*.

2

2008 and was earning about $15 per hour working 6 to 8 hours a day, 4 to 5 days a week. (R. 32). He explained that he was doing this on a trial basis to see if he was able to do it. (R. 37). Prior to that he had worked in the same capacity for 10 to 20 hours a week in 2006 and 2007. (R. 32).

The Administration sent Mr. Gagnon a notice on September 10, 2008, informing him that it had information that he was performing substantial work beginning in March 2007, meaning that his disability had ended and he was not entitled to payments he had received in June 2007, August 2007, and from October 2007 on. (R. 38). The notice explained that Mr. Gagnon had been allowed a 9-month trial work period beginning in June 2006 and ending in February 2007. (R. 39). The notice also indicated that Mr. Gagnon would be getting word about any overpayment he received during that time. (R. 40). Finally, the notice gave Mr. Gagnon 15 days to provide any information he thought was pertinent to the Administration's decision. (R. 41).

Mr. Gagnon didn't get his 15 days; he didn't even get 3 days. The Administration sent its Notice of Disability Cessation on September 12, 2008, telling Mr. Gagnon that it had determined that his disability ended, and he was not entitled to payments received in June 2007, August 2007, and from October 2007 on. (R. 42). Because the Administration didn't stop sending him checks until September 2008, he was paid $14,400.10 too much in disability benefits. (R. 43). There is no dispute that Mr. Gagnon eventually paid this back; it was withheld from his subsequent benefit checks. (R. 79, 100).

In October 2008, Mr. Gagnon provided another continuing disability report to the Administration, stating that he had been working 4 to 5 hours a day 4 to 5 hours a week

3

as a grocery inventory clerk since 2005, earning 10.50 an hour. (R. 56). Three months after that, in January 2009, the Administration determined that Mr. Gagnon had not experienced medical improvement and his disability continued. (R. 62-63). Apparently, at about that time, it restarted Mr. Gagnon's disability insurance payments. (R. 77).

There seems to be no further contact between Mr. Gagnon and the Administration until January 2012, when Mr. Gagnon wrote to the Administration asking them to stop his disability benefits checks because he had improved and would soon be working full-time at the grocery store. (R. 64). In March 2012, the Administration determined internally that Mr. Gagnon had performed substantial gainful activity from November 2008 to January 2009, and in April 2009, August 2009, November 2009, and from October 2010 on. (R. 76). It sent Mr. Gagnon notice of this determination on April 14, 2012, again giving him 15 days to respond. (R. 77). Mr. Gagnon responded by explaining that he had only been working part-time and attached his W-2. He reminded the Administration that he had already repaid the previous overpayment. (R. 79-80). The Administration than wrote to Mr. Gagnon telling him its decision stood and he would, once again, be getting information about another overpayment. (R. 84).

The Administration sent Mr. Gagnon the bill on July 18, 2012, in the amount of $31,950.90. (R. 89). The amount was due in less than a month, on August 3, 2012. (R. 89). For some reason, the notice stated that the Administration had not received payment – how could it have, it had just sent the notice – and that payment should be sent right away. It did give Mr. Gagnon the option of asking for monthly payment plan. (R. 89).

On October 1, 2012, the Administration sent another notice to Mr. Gagnon, informing him of the $31,950 overpayment. This one broke the amount down on a

month-by-month basis. (R. 93-94). It sent another notice telling Mr. Gagnon he was no longer entitled to disability benefits as of October 2010 on October 31, 2012. (R. 97).

On November 9, 2012, Mr. Gagnon exercised his option to request a waiver of repayment, arguing that overpayment was not his fault and he could not afford to pay over $30,000 back to the Administration. (R. 99). His take-home pay was $450 per month and he had $3108 in his checking account. (R. 102-103). His monthly expenses were more than he took home, and he had to get support from his parents. (R. 105).

Four days later, the Administration informed Mr. Gagnon that it could not approve his request for a waiver, but said he could come in for a conference about the issue. (R. 107). Mr. Gagnon asked for an administrative hearing on his case. After a postponement so that Mr. Gagnon could obtain a representative (R. 131), an administrative law judge ("ALJ") convened a hearing on July 18, 2013, with Mr. Gagnon choosing to forgo representation. (R. 153).

Mr. Gagnon testified that he lived with his parents, who were retired and receiving Social Security retirement benefits. (R. 161). He said he continued to work at the grocery store and his mental health was good; panic attacks were few and far between. (R. 162). About a month before his hearing, he had increased his hours to full time. (R. 162). When he had the money, he paid his parents some rent – $100 to $200 – and tried to chip in for groceries. (R. 168). Mr. Gagnon was confused about the overpayment because he had notified the Administration he was working and he was making so little money at the time. (R. 165-166). And, since the Administration knew he was working, he couldn't understand why they wouldn't notify him of an overpayment until it got up to more than $30,000. (R. 172-173). He had even notified

5

the Administration when his condition improved and he was going to try to work full time. (R. 175). He said he didn't know he had to send in his pay stubs. Mr. Gagnon didn't think the overpayment was his fault, but if it was, he thought he could pay back about $25 or $50 a month. (R. 177).

On August 1, 2013, the ALJ issued her decision. She found that there had been an overpayment of $31,408.70 for the period from October 2010 through April 2012. (R. 17). She determined that Mr. Gagnon was at fault in causing the overpayment. She noted that Mr. Gagnon had written to the Administration to stop his benefits in January 2012, and that he had had a previous overpayment. (R. 18). The ALJ noted that Mr. Gagnon had stated that Mr. Gagnon had a responsibility to report not just that he was working, but his earnings. She said Mr. Gagnon's award notice contained his reporting responsibilities and that, because he had been through a previous overpayment situation, he should have been aware of his reporting responsibilities as well as the fact that his work activities could result in an overpayment. (R. 19). Finally, the ALJ concluded that recovery of the overpayment was not waived because Mr. Gagnon testified he was working full time and that he could repay $25 or $50 a month. (R. 19). The ALJ said that, based on Mr. Gagnon's earnings, "a repayment plan of perhaps $50.00 per month seems appropriate." (R. 19).

Mr. Gagnon asked the Appeals Council to review the ALJ's decision. On March 27, 2015, the Appeals Council determined that the ALJ was right about there having been a $31,408.70 overpayment, but that the period was from June 2007 through April 2012. Mr. Gagnon was not due benefits in June 2007, August 2007, October 2007 through August 2008, November 2008 through January 2009, August 2009, and November 2009

because of work activity, and not due benefits from October 2010 through April 2012 because his benefits terminated. (R. 8). The Appeals Council stated that Mr. Gagnon had been informed of his reporting responsibilities in his initial award letter, but had failed to timely inform the Administration that his earnings rose above substantial gainful activity levels after his trial work period ended in February 2007. (R. 9). The Appeals Council also noted that Mr. Gagnon had filed two continuing disability reports meaning that he was aware of his responsibilities. (R. 9). As such, Mr. Gagnon was at fault in causing the overpayment. (R. 9). He also knew or should have known that he should not have accepted checks from November 2010 through April 2012, after his benefits were terminated due to substantial gainful activity. (R. 9). The Council concluded that recovery was not waived and Mr. Gagnon was liable for a repayment of $31,408.70. (R. 9).

## ANALYSIS

There is no dispute that Mr. Gagnon received an overpayment. When the Agency mistakenly has made an overpayment of disability benefits, it may not recover an overpayment from the recipient when: (1) the recipient is without fault and (2) "recovery would defeat the purpose of [the Social Security Act] or would be against equity and good conscience." 42 U.S.C. 404(b). According to the regulations governing the implementation of this statutory provision, "[a]lthough the [Agency] may have been at fault in making the overpayment, that fact does not relieve the overpaid individual or any other individual from whom the Administration seeks to recover the overpayment from liability for repayment if such individual is not without fault." 20 C.F.R. § 404.507. A finding of fault can be based on any of the following:

7

> (a) An incorrect statement made by the individual which he knew or should have known to be incorrect; or

(b) Failure to furnish information which he knew or should have known to be material; or

(c) With respect to the overpaid individual only, acceptance of a payment which he either knew or could have been expected to know was incorrect.

20 C.F.R. §404.507. The Commissioner's determination that Mr. Gagnon was not without fault in causing the overpayment in this case is based on subsections (b) and (c).

We begin with subsection (b), the "[f]ailure to furnish which he knew or should have known was material. The ALJ said that the award notice Mr. Gagnon received "contained reporting responsibilities" (R. 19), and the Appeals Council stated that "the Administration notified [Mr. Gagnon] of his responsibility to report changes to his work activity in his initial award letter . . . ." (R. 8). Actually, the letter itself was not specific about reporting requirements – why such letters are not is a mystery as it would be simple to just say "tell us if you happen to go back to work" – but did state that:

> We have enclosed a pamphlet, "When You Get Social Security Disability Benefits ...What You Need To Know." It will tell you what must be reported and how to report. Please be sure to read the parts of the pamphlet which explain what to do if you go to work or if your health improves.
> \* \* \*
> If you go to work, special rules can allow us to continue your cash payments and health insurance coverage. For more information about how work and earnings may affect disability benefits, you may call or visit any Social Security office.

(R. 21).

The pamphlet referred to is not a part of the record but, according to the Commissioner's brief, the pamphlet is SSA publication No. 05-10153. [Dkt. #20, at 3]. The version available online does, indeed, inform the benefits recipient that they:

> should tell [the Administration] *if you take a job or become self-employed*, no matter how little you earn. *Please let us know how many hours you expect to work, and when your work starts or stops*. If you still have a

8

> qualifying disability, you'll be eligible for a trial work period, and you can continue receiving benefits for up to nine months. Also, tell us if you have any special work expenses because of your disability (such as specialized equipment, a wheelchair or even prescription drugs), or if there's any change in the amount of those expenses.

https://www.ssa.gov/pubs/EN-05-10153.pdf (emphasis supplied). As can be seen, there is nothing in this section about reporting earnings or providing the Administration with pay stubs, despite what the ALJ (R. 19), the Appeals Council (R. 9), and the Commissioner [Dkt. #20, at 3] seem to think. The section only states that the benefits recipients' report whether they are working and how many hours they are working. Mr. Gagnon did not only that, but reported his hourly wage which ought to have made it easy for the Administration to see that it was likely he was performing substantial gainful activity, at least in certain months.[2]

As of 2008, Mr. Gagnon was working between 16 and 25 hours a week, and earning $10.50 per hour. That means he was earning $168-$262.50 a week or $672-$1050 a month. He reported this to the Administration. (R. 56). The substantial gainful activity cutoff for 2008 was $940 a month, $980 for 2009, $1000 for 2010 and 2011, and $1010 for 2012. https://www.ssa.gov/oact/cola/sga.html. Mr. Gagnon never indicated his hours decreased so, as far as the Administration knew, Mr. Gagnon was likely engaging in substantial gainful activity in 2008 and beyond. And, Mr. Gagnon told them so in October of that year. He reported how many hours he was working or expected to work, just as the pamphlet directed. It's unclear from the opinions of the Appeals Council and the ALJ what more Mr. Gagnon had to do. The Appeals Council's finding

---

[2] The Commissioner contends that the problem is that Mr. Gagnon failed to "timely report[] his work activity to the agency when he changed the number of hours he was working as of December 2010." [Dkt. #20, at 3]. Neither the Appeals Council (R. 7-9) nor the ALJ (R. 16-19) mention anything about a change in hours in December 2010. Under the *Chenery* doctrine, the Commissioner's lawyers cannot rework the decisions of the Appeals Council or the ALJ to supply rationale to support the result. *See SEC v. Chenery Corp.,* 318 U.S. 80, 87–88 (1943); *Meuser v. Colvin*, 838 F.3d 905, 911 (7th Cir. 2016). But even if that were allowed, it is still not clear from the Commissioner's brief, which includes no citation to the record on this point, what the significance of December 2010 was. The overpayment for 2010 was determined to have begun in October. (R. 8).

9

that Mr. Gagnon was at fault because he failed to report that his earnings rose above the level of substantial gainful activity after 2007 (R. 9), is not supported by substantial evidence because the document Mr. Gagnon filed in October 2008 should have done the job, and there is nothing in the materials that the Commissioner relies on that require a benefits recipient to report *earnings* rather than *hours*. If the Commissioner's decision on this issue was actually based on some other notice or warning, that rationale is certainly not illuminated in either of the administrative decisions or the Commissioner's brief.

That leaves 20 C.F.R. §404.507(c), whether Mr. Gagnon accepted payments which he either knew or could have been expected to know were incorrect. The ALJ, the Appeals Council, and the Commissioner's brief all make much of the fact that Mr. Gagnon continued to accept benefits checks after his benefits were terminated in November 2010. But, while the Administration decided to terminate benefits in November 2010, they kept that a secret from Mr. Gagnon and kept sending him checks. No one – not ALJ, not the Appeals Council, not the Commissioner – cites to anything that would have informed Mr. Gagnon that his benefits terminated. In January 2012, Mr. Gagnon wrote to the Administration telling them that he wanted his disability benefits stopped because he would soon be working full time. The Administration didn't inform Mr. Gagnon that his benefits had terminated in November 2010 until October 31, 2012. (R. 97). The Commissioner asks why Mr. Gagnon would accept checks from November 2010 through April 2012 when his benefits had been terminated. [Dkt. #20, at 4]. Well, the easy answer is he didn't know they had been terminated – the Administration kept sending checks, after all – until the Administration notified him on October 31, 2012. The better question is why the Administration sent Mr. Gagnon checks for two years after it terminated his benefits.

It may well be that there is evidence to show that Mr. Gagnon either failed to furnish information he was obligated to provide or that he accepted payments he ought to

have know he wasn't entitled to, but as the Appeals Council's and ALJ's decisions are written, they cannot be affirmed. *O'Connor–Spinner v. Colvin*, 832 F.3d 690, 698 (7th Cir. 2016)(ALJ must "build an accurate and logical bridge between the evidence . . . and [her] ultimate conclusion."); *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)(". . . we cannot uphold a decision by an administrative agency, any more than we can uphold a decision by a district court, if, while there is enough evidence in the record to support the decision, the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."). Neither decision is supported by citation to any notice or pamphlet section telling Mr. Gagnon that he had to report his earnings or provide pay stubs – nor, for that matter, is the Commissioner's brief. The materials the court has been directed to all indicate he had to report hours. The last time he did that, simple math shows that it was likely he was over the substantial gainful activity threshold. Similarly, the court has not been directed to any notice or evidence that would have informed Mr. Gagnon that his benefits were terminated in November 2010. Based on the record before me, the Administration didn't get around to that until two years later. On remand, the ALJ or Appeals Council Commissioner should take care to provide a rationale that allows a reviewing court to trace the path of their reasoning. We should not have to infer their reasoning. And, that being said, it would behoove Mr. Gagnon to be a more active participant in his case, especially should it find its way back to federal court.

## CONCLUSION

For the foregoing reasons, the Commissioner's motion for summary judgment [Dkt. #19] is denied and this case is remanded to the Commissioner for further proceedings consistent with this opinion.

ENTERED: _____
UNITED STATES MAGISTRATE JUDGE

**DATE: 1/19/17**